UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Court No. 22-00327 |
| v. | ) ) | |
| AEGIS SECURITY INSURANCE COMPANY, | ) ) | |
| Defendant. | ) ) | |

## <u>ORDER</u>

Upon consideration of the Motion of Defendant, Aegis Security Insurance Company, for

Summary Judgement, and all other papers and proceedings had herein, and after due deliberation,

it is hereby

**ORDERED** that the Motion for Summary Judgement is GRANTED; and it is further

**ORDERED** that Court No. 22-00327 is dismissed.

_____
Jane A. Restani, Judge

Dated: _____, 2024
       New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. JANE A. RESTANI, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AEGIS SECURITY INSURANCE COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)   Court No. 22-00327<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

Defendant, Aegis Security Insurance Company, pursuant to Rule 56 of the Rules of the United States Court of International Trade, moves this Court for summary judgment against Plaintiff, the United States. Summary judgment in favor of Defendant is appropriate because there are no genuine issues of material fact, and Defendant is entitled to judgment in its favor as a matter of law, as explained in the accompanying memorandum of law.

WHEREFORE, Defendant respectfully moves this Court to enter an order granting its motion for summary judgment in this action.

Respectfully submitted,

*/s/ Jason M. Kenner*
Jason M. Kenner
Sandler, Travis & Rosenberg P.A.
675 Third Avenue
Suite 2425
New York, New York 10017
Tel.: 212-549-0137
E-Mail: jkenner@strtrade.com

*/s/ Jeffery M. Telep*
Jeffery M. Telep
King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, D.C. 20006
Tel.: 202-626-2390
E-Mail: jtelep@kslaw.com

*Attorneys for Defendant Aegis Security Insurance Company*

October 21, 2024

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. JANE A. RESTANI, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AEGIS SECURITY INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

Court No. 22-00327

**PUBLIC VERSION**

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGEMENT**

Jason M. Kenner
Sandler, Travis & Rosenberg P.A.
675 Third Avenue
Suite 2425
New York, New York 10017
Tel.: 212-549-0137
E-Mail: jkenner@strtrade.com

Jeffery M. Telep
King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, D.C. 20006
Tel.: 202-626-2390
E-Mail: jtelep@kslaw.com

*Attorneys for Defendant Aegis Security Insurance Company*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

EXHIBITS ................................................................................... vii

I.     BACKGROUND ....................................................................4

    A.    Surety Liability for Customs' Duties ................................. 4

    B.    The Customs Bond Program ........................................... 5

    C.    The Single Transaction Bond At Issue ............................. 7

    D.    The Subject Entry ........................................................8

    E.    Customs' Billing of Aegis ............................................ 10

II.    STANDARD OF REVIEW .....................................................11

III.    ARGUMENT .....................................................................11

    A.    The United States' Cause of Action Against The Subject Entries Is Barred By The Six-Year Statute Of Limitations Set Forth In 28 U.S.C. § 2415(a) ......... 11

        1.    The statute of limitations accrued on the date of deemed liquidation of the Subject Entry .................................12

        2.    Section 1505(b) does not mandate that the United States' claims accrue upon demand by Customs .............................18

        3.    The Court must read the assessment, liquidation, and collection statutes in *pari materia* ...................................22

        4.    The "pay, as demanded," language in the Subject Bond makes clear that the United States' cause of action accrued upon deemed liquidation .................................................23

    B.    The United States Cannot Recover Under The Bond Because It Failed To Issue Its Bill Within A Reasonable Amount of Time Following Liquidation ................................................... 25

    C.    The United States' Cause Of Action Is Barred By The Doctrine Of Impairment Of Suretyship ................................. 29

        1.    Customs impaired Defendant's suretyship status by fundamentally altering the parties' rights and obligations under the Subject Bond .........32

        2.    Customs impaired Defendant's suretyship status by depriving Defendant of recourse .................................................34

IV.     CONCLUSION...................................................................................................................35

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................. 11

*Application for Further Review of Protest
No. 5201-13-100147*,
No. HQ H249804, 2017 U.S. Custom HQ Lexis 1211
(Cust. B. & Dec. Apr. 3, 2017) .......................................................... 14, 32

*Citizens Utils. Co. v. Am. Tel. & Tel. Co.*,
    595 F.2d 1171 (9th Cir. 1979) ............................................................... 28

*Curry v. United States*,
    679 F. Supp. 966 (N.D. Cal. 1987) ........................................................ 26

*Cyber Power Sys. (USA) Inc. v. United States*,
    586 F. Supp. 3d 1325 (Ct. Int'l Trade 2022) ........................................ 17

*Davis v. Mich. Dep't of Treasury*,
    489 U.S. 803 (1989).................................................................................. 22

*Dep't of Revenue v. AFC Indus., Inc.*,
    510 U.S. 332 (1994).................................................................................. 22

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000).................................................................................. 22

*FTC v. Mandel Bros.*,
    359 U.S. 385 (1959).................................................................................. 22

*Gritz Harvestore, Inc. v. A.O. Smith Harvestore Prods. Inc.*,
    769 F.2d 1225 (7th Cir. 1985) ............................................................... 31

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995).................................................................................. 22

*Hartford Fire Ins. Co. v United States*,
    772 F.3d 1281 (Fed. Cir. 2014) ............................................................. 30

*Hartford Fire Ins. Co. v. United States*,
    254 F. Supp. 3d 1333 (Ct. Int'l Trade 2017) ........................................ 32

*Int'l Trading Co. v. United States* (*Int'l Trading II*),
    281 F.3d 1268 (Fed. Cir. 2002) ................................................. 16, 17, 23

*Int'l Trading Co. v. United States* (*Int'l Trading III*),
    412 F.3d 1303 (Fed. Cir. 2005) ................................................................. 16, 17, 23

*Lyell Theatre Corp. v. Loews Corp.*,
    682 F.2d 37 (2d Cir. 1982) ..................................................................................... 28

*Mitsubishi Elecs. Am., Inc. v. United States*,
    44 F.3d 973 (Fed. Cir. 1994) ................................................................................. 24

*Mountain States Tel. & Tel. v. Pueblo of Santa Ana*,
    472 U.S. 237 (1985) ................................................................................................ 22

*Nat'l Sur. Corp. v. United States*,
    118 F.3d 1542 (Fed. Cir. 1997) .............................................................................. 31

*Nyhus v. Travel Mgmt. Corp.*,
    466 F.2d 440 (D.C. Cir. 1972) ................................................................... 24, 26, 27

*Old Republic Ins. Co. v. United States*,
    645 F. Supp. 943 (Ct. Int'l Trade 1986) ................................................................ 30

*Phone-Mate, Inc. v. United States*,
    690 F. Supp. 1048 (Ct. Int'l Trade 1988) .............................................................. 11

*Second Nature Designs, Ltd. v. United States*,
    586 F. Supp. 3d 1334 (Ct. Int'l Trade 2022) ......................................................... 18

*St. Petersburg Bank & Tr. Co. v. Boutin*,
    445 F.2d 1028 (5th Cir. 1971) ............................................................................... 30

*Thyssenkrupp Steel N. Am., Inc. v. United States*,
    886 F.3d 1215 (Fed. Cir. 2018) ................................................................... 4, 12, 21

*United States v. Aegis Security Insurance Co.* (*Aegis I*),
    693 F. Supp. 3d 1328 (Ct. Int'l Trade 2024) ................................................. *passim*

*United States v. Am. Home Assurance Co.* (*AHAC 2016*),
    151 F. Supp. 3d 1328 (Ct. Int'l Trade 2016) ................................................... 14, 33

*United States v. Am. Home Assurance Co.* (*AHAC*),
    653 F. Supp. 3d 1277 (Ct. Int'l Trade 2023) ................................................. *passim*

*United States v. Am. Home Assurance Co.*,
    35 C.I.T. 585 (2011) ......................................................................................... 14, 32

*United States v. Ataka Am., Inc.*,
    826 F. Supp. 495 (Ct. Int'l Trade 1993) ......................................................... 14, 32, 33

*United States v. Cherry Hill Textiles, Inc.*,
    112 F.3d 1550 (Fed. Cir. 1997) ............................................................................... 22

*United States v. Cocoa Berkau, Inc.*,
    990 F.2d 610 (Fed. Cir. 1993) ............................................................ 12, 14, 15, 24

*United States v. Commodities Export Co.*,
    972 F.2d 1266 (Fed. Cir. 1992) ....................................................... 15, 24, 25, 26

*United States v. Gordon*,
    No. 90 Civ 4016, 1994 WL 514533 (S.D.N.Y. Sept. 21, 1994) .......................... 26

*United States v. Gordon*,
    78 F.3d 781 (2d Cir. 1996) ..................................................................................... 27

*United States v. Gottleib*,
    948 F.2d 1128 (9th Cir. 1991) ............................................................................... 26

*United States v. Great Am. Ins. Co.*,
    738 F.3d 1320 (Fed. Cir. 2013) ....................................................................... 29, 30

*United States v. Great Am. Ins. Co.*,
    791 F. Supp. 2d 1337 (Ct. Int'l Trade 2011) ................................................. 14, 33

*United States v. Ins. Co. of N. Am.*,
    83 F.3d 1507 (D.C. Cir. 1996) ............................................................................... 24

*United States v. Int'l Fid. Ins. Co.*,
    273 F. Supp. 3d 1170 (Ct. Int'l Trade 2017) ........................................................ 14

*United States v. Rollinson*,
    866 F.2d 1463 (D.C. Cir. 1989) ............................................................................. 26

*United States v. Vanornum*,
    912 F.2d 1023 (8th Cir. 1990) ............................................................................... 26

**Statutes**

19 U.S.C. § 1500 ....................................................................................................................... 9

19 U.S.C. § 1504 ............................................................................................................... *passim*

19 U.S.C. § 1505 ............................................................................................................... *passim*

19 U.S.C. § 1514 ....................................................................................................... 9, 12, 24

19 U.S.C. § 1675 ..................................................................................................................... 16

19 U.S.C. § 1675(a)(2)(B)(iii) (1993) .................................................................................. 8

19 U.S.C. § 580 ................................................................................................... 29

28 U.S.C. § 1582 ................................................................................................. 17

Customs Procedural Reform and Simplification Act of 1978,
  Pub. L. No. 95-410, 92 Stat. 888 ................................................................ 23

Pension Protection Act of 2006,
  Pub. L. No. 109-280, 120 Stat. 780 .............................................................. 8

Trade Facilitation and Trade Enforcement Act of 2015,
  Pub. L. No. 114-125, 130 Stat. 122 (2016) ................................................... 8

**Regulations**

19 C.F.R. § 24.3a ................................................................................................ 21

19 C.F.R. § 113.62 ........................................................................................ 23, 24

19 C.F.R. § 141.1 ..................................................................................... 4, 12, 21

19 C.F.R. § 351.214 .............................................................................................. 8

*Notice of Amended Final Determination of Sales at Less Than Fair Value and
  Antidumping Duty Order; Honey From the People's Republic of China,*
  66 Fed. Reg. 63,670 (Dec. 10, 2001) ............................................................. 8

**Other Authorities**

Answer, *Maple Leaf Marketing, Inc. v. United States,*
  No. 20-03839 (Ct. Int'l Trade Jan. 20, 2023), Dkt. No. 21 ........................ 17

Answer, *Second Nature Designs Ltd. v. United States,*
  No. 18-00131 (Ct. Int'l Trade Feb. 14, 2023), Dkt. No. 29 ........................ 17

H.R. Rep. No. 98-1015 (1984),
  *as reprinted in* 1984 U.S.C.C.A.N. 4960 ................................................... 20

H.R. Rep. No. 103-361, pt. 1 (1993),
  *as reprinted in* 1993 U.S.C.C.A.N. 2552 ................................................... 20

Restatement (First) Security (1941) ................................................................... 31

Restatement (Third) of Suretyship and Guaranty (1996) .......................... *passim*

## EXHIBITS

**EXHIBIT 1**    Bruce Ingalls Deposition Transcript, June 5, 2024, Court No. 22-00327

**EXHIBIT 2**    **[CONFIDENTIAL]** Antidumping and/or Countervailing Duty Entry Processing to Prevent Liquidations by Operation of Law, June 23, 2006

**EXHIBIT 3**    Plaintiff's Response to Defendant's Second Set of Interrogatories upon Plaintiff, May 24, 2024

**EXHIBIT 4**    **[CONFIDENTIAL]** Antidumping/Countervailing Duty (AD/CVD) Handbook, August 2018

**EXHIBIT 5**    **[CONFIDENTIAL]** Customs Directive 5350-017, September 17, 1993

**EXHIBIT 6**    **[CONFIDENTIAL]** CBP Publication titled "INFORMATION: Verification of Bills and Refunds", June 26, 2018

**EXHIBIT 7**    **[CONFIDENTIAL]** William Wollyung Deposition Transcript, Aug. 13, 2024, Court No. 22-00327

**EXHIBIT 8**    **[CONFIDENTIAL]** William Wollyung Deposition Transcript, Feb. 9, 2022, Court No. 20-03628

**EXHIBIT 9**    **[CONFIDENTIAL]** James Zuhlke Deposition Transcript (Day 1), Feb. 8, 2022, Court No. 20-03628

**EXHIBIT 10**    **[CONFIDENTIAL]** General Agent Agreement Between Aegis and Avalon, Ex. 21 to James Zuhlke Deposition Transcript, Feb. 8, 2022, Court No. 20-03628

**EXHIBIT 11**    Defendant's First Supplemental Objections and Responses to Plaintiff's First Interrogatories And Requests For Production of Documents and Things Directed To Defendant, Ex. 12 to Gale Dierschow Deposition Transcript, Feb. 8, 2022, Court No. 20-03628

**EXHIBIT 12**    Defendant's Objections and Responses to Plaintiff's Interrogatories Directed to Defendant, August 8, 2024

**EXHIBIT 13**    **[CONFIDENTIAL]** Aegis/Avalon Claims Management Agreement, Ex. 22 to James Zuhlke Deposition Transcript, Feb. 8, 2022, Court No. 20-03628

**EXHIBIT 14**    **[CONFIDENTIAL]** Aegis/Avalon Surety Agent Agreement, Jan. 1, 2010

**EXHIBIT 15**    **[CONFIDENTIAL]** J. Zuhlke Deposition Transcript (Day 2), Feb. 9, 2022, Court No. 20-03628

**EXHIBIT 16**    **[CONFIDENTIAL] Quota Share Reinsurance Agreement between Aegis and LGIC,** Ex. 25 to W. Wollyung Deposition Transcript, Feb. 9, 2022, Court No. 20-03628

**EXHIBIT 17**  **[CONFIDENTIAL] Reinsurance Agreement between Aegis and Gen Re,** Ex. 24 to W. Wollyung Deposition Transcript, Feb. 9, 2022, Court No. 20-03628

**EXHIBIT 18**  **[CONFIDENTIAL]** Aegis & Kingsway Indemnity & Hold Harmless Agreement, Feb. 1, 2002

**EXHIBIT 19**  Complaint & Exhibits.

**EXHIBIT 20**  Message No. 5215202, Aug. 3, 2005

**EXHIBIT 21**  Message No. 9027206, Jan. 27, 2009

**EXHIBIT 22**  **[CONFIDENTIAL]** ADD Message No. 9027206, Ex. 20 to B. Ingalls Deposition Transcript, June 5, 2024, Court No. 22-00327

**EXHIBIT 23**  **[CONFIDENTIAL]** Aegis Memo to Lincoln General, Feb. 12, 2009

**EXHIBIT 24**  Order of Liquidation, Nov. 5, 2015, Ex. 27 to W. Wollyung Deposition Transcript Court No. 20-3628

**EXHIBIT 25**  **[CONFIDENTIAL]** AEGIS-CIT-22-327-0168

**EXHIBIT 26**  U.S. Security and Exchange Commission Form 10K for Kingsway Financial Services, Ex. 28 to William Wollyung Deposition Transcript, Feb. 9, 2022, Court No. 20-03628

**EXHIBIT 27**  Settlement Agreement, United States District Court Middle District of Pennsylvania, *Aegis Security Insurance Co. v. Kingsway Financial Services, Inc*., Jan. 20, 2020, Court No. 1:16-cv-1555

**EXHIBIT 28**  Stipulation of Dismissal, United States District Court Middle District of Pennsylvania, *Aegis Security Insurance Co. v. Kingsway Financial Services, Inc*., Jan. 20, 2020, Court No. 1:16-cv-1555

**EXHIBIT 29**  Proposed Order of Dismissal, United States District Court Middle District of Pennsylvania, *Aegis Security Insurance Co. v. Kingsway Financial Services, Inc*., Jan. 20, 2020, Court No. 1:16-cv-1555

**EXHIBIT 30**  **[CONFIDENTIAL]** Aegis/Kingsway Escrow Agreement, Jan. 31, 2020

**EXHIBIT 31**  **[CONFIDENTIAL] Aegis's LAE Spreadsheet,** Ex. 6 to William Wollyung Deposition Transcript, Court No. 22-00327

**EXHIBIT 32**  Defendant's Answer to Plaintiff's Complaint, Mar. 24, 2023, Court No. 22-00327

**EXHIBIT 33**  Protest of Entry, Apr. 25, 2017

**EXHIBIT 34**  **[CONFIDENTIAL]** OT:TPP:AD/CVD Policy AA, Jan. 6, 2013

**EXHIBIT 35**  James Zuhlke Declaration, Sept. 13, 2021, Ex. 17 to James Zuhlke Deposition Transcript, Feb. 8, 2022, Court No. 20-03628

This is a civil action brought by Plaintiff, the United States of America (the "United States" or "Government"), against Defendant, Aegis Security Insurance Company ("Aegis" or "Defendant"), for the collection of unpaid antidumping duties in the amount of $100,700, plus interest, owed on a single entry of honey from the People's Republic of China ("PRC"), entered by Presstek Wood Technologies ("Presstek," "principal," or "importer"). The duties were secured by a single transaction bond ("STB") with a penal value of $100,700, underwritten by Aegis.

Summary judgment should be entered in Aegis's favor for three reasons. First, the United States' action is barred as a result of its failure to commence the action within the applicable six-year statute of limitations. Second, even if the action were timely filed, summary judgment still should be entered because U.S. Customs and Border Protection ("Customs" or "CBP") failed to issue Aegis a bill within a reasonable amount of time, and that failure breached the implied terms of the STB. Finally, even if the action were not time barred or the bond terms breached, summary judgment should be entered in Aegis's favor because, during Customs' inordinate and inexcusable delay in billing Aegis, Aegis's reinsurer went insolvent, documents were lost or destroyed, recollections faded, interest piled up, and certain other features of Aegis's insurance program were negatively impacted. As a result, Aegis was prejudiced and its suretyship was impaired.

This is not the first collection action addressing these critical legal issues. The United States brought two prior similar actions, both of which were dismissed by this Court. First, on September 16, 2020, the United States commenced *United States v. American Home Assurance Company* (*AHAC*), 653 F. Supp. 3d 1277 (Ct. Int'l Trade 2023) against American Home Assurance Company ("American Home") to collect on bonds securing antidumping duties on entries of preserved mushrooms. The underlying entries deemed liquidated between February 20, 2003, and January 11, 2004. *Id.* at 1281. "Then, more than a decade passed. During that time, Customs

took no action to collect on the debts owed by the importers….” *Id.*  Approximately 11 years after the deemed liquidations, on September 26, 2014, Customs finally sent bills to the importer and, on July 6, 2015, and February 3, 2016, sent bills to the surety, American Home.  *Id.* at 1281-82.  Approximately four years later, Customs commenced a collection action.  *Id.* at 1282.  Among other defenses, American Home asserted that the action was time barred by the applicable statute of limitations, as it was not filed within six-years of the deemed liquidations.  Like here, Customs argued that its action was timely because the six-year statute of limitations did not commence upon deemed liquidation but only when Customs issued a bill to the surety.  Rejecting Customs’ argument, the *AHAC* Court found that the statute of limitations commenced upon deemed liquidation.  *Id.* at 1286-93.  The Court explained that all elements necessary for its claim existed at deemed liquidation (duty liability had attached and the amount of liability became fixed) and therefore the statute of limitation commenced at that time.  Because the action was not commenced within six years of the deemed liquidation of the underlying entries, the Court dismissed the complaint as untimely.  Notably, in the alternative, the court found “that Customs’ suit was untimely based on [CBP’s] failure to act in a reasonable time.”  *Id.* at 1293-95.  The United States did not appeal *AHAC*.

Second, on October 2, 2020, the United States commenced *United States v. Aegis Security Insurance Co.* (*Aegis I*), 693 F. Supp. 3d 1328 (Ct. Int’l Trade 2024) against Aegis to collect on bonds securing ten entries of garlic imported from the PRC.  The underlying entries deemed liquidated on November 4, 2006.  “For nearly eight years after the deemed liquidation, nothing happened.”  *Id.* at 1333.  Then, on October 3 and 31, 2014, CBP finally billed the importer, and on January 7, 2015, billed Aegis.  *Id.*  Because Aegis believed the bill to be untimely, it did not pay.  *Id.*  Nearly five years later customs brought an action seeking to collect unpaid duties from

**Public Version, Confidential Material Omitted**

Aegis.  *Id.*  Like in *AHAC*, Aegis asserted several defenses including statute of limitations. Although the *Aegis I* Court found that the statute of limitations did not commence until Customs billed Aegis, the Court nevertheless dismissed the Government's complaint because "the Government unreasonably delayed making demand for more than eight years, [thus] it breached the bond contract and cannot [] recover under that contract." *Id.* at 1340.  The United States did not appeal *Aegis I.*

Having struck out twice already, the United States steps to the plate for a third time on its discredited theories.  But as in *AHAC* and *Aegis I*, the Government's case must fail because Customs again failed to timely liquidate an entry, waited ten years after a deemed liquidation to send the surety a bill, and waited even longer to commence an action.  Worse yet, rather than appealing either of its losses and getting a definitive, binding ruling that its collection practices are illegal, the United States continues to pursue meritless cases against sureties in this Court, forcing them to incur substantial and completely unnecessary litigation expenses.  At the same time, Customs continues to threaten to refer new cases to the Department of Justice for commencement of collection actions on similarly infirm facts.  In the latest example, Customs emailed Aegis demanding payment of duties for entries made by Safa Metal Works, Inc. that had been deemed liquidated years ago.  *See* Email from Customs to Aegis dated September 13, 2024, attached as Appendix A ("[w]ith the approaching statute of limitations deadline as CBP understands it, I will be referring these bills to the Department of Justice for collection action in the near future").

The Government must be stopped.  Customs plainly has no internal procedure for restraining its own unreasonable conduct.  Rather, it blindly follows the mechanical rules of liquidation and collection without regard to whether those rules are reasonable. According to Customs' Director of the Revenue Division, Office of Finance,

> I tell people [to] look at the letter of the law [and] apply it. And sometimes it sounds … kind of harsh. But I didn't write the law; I just enforce the law. And in this case and with any other cases, I just try to execute. I teach people to execute what the law says and then let people with a higher pay grade determine if that's reasonable or unreasonable.

Defendant's Statement of Undisputed Material Fact ("DSUMF") ¶ 12.[1]  As to who should make

the determination as to reasonableness:

> I would say the court or someone other than the executors. The jury, whoever the jury is. I guess in this case, the judge is the jury. But … if there's no limitation, I think we need to pursue it to the degree that it's legal, allowable, and let it go from there. Let others decide what they [deem] to be reasonable or not.

*Id.*  Customs also acknowledges that, when it does not follow its procedures for collection, it causes

heartburn for the surety: "when Customs gets burned, a surety is getting burned…. That's the

nature of the beast."  DSUMF ¶ 10.

In mechanically applying the liquidation and collection rules without regard to whether

those rules are being applied reasonably, Customs is inviting this Court to "just say no" to

unreasonable collection efforts.  It is time for the Third Branch to act, establish the date of deemed

liquidation as the date the statute of limitations begins to run against sureties, or hold that Customs'

demand in this case was unreasonable and/or impaired Aegis's suretyship status.

## I.     BACKGROUND

### A.     Surety Liability for Customs' Duties

There is no dispute that an importer becomes liable for duties owed at the moment its

merchandise arrives in the United States.  *Thyssenkrupp Steel N. Am., Inc. v. United States*, 886

F.3d 1215, 1218 (Fed. Cir. 2018) (citing 19 C.F.R. § 141.1(a)).  And the surety is jointly and

severally liable with the importer for duties.  *AHAC*, 653 F. Supp. 3d at 1291-92 and authorities

---

[1] In this memorandum of law, Aegis refers to the Defendant's Statement of Undisputed Material Facts for its extensive record citations supporting each point for ease of reading.

cited therein.  Further, Customs agrees, as it must, that because a surety is jointly and severally liable with the importer under customs bonds, the surety's duty liability also attaches when merchandise secured by the bond is entered.  DSUMF ¶ 1.  Although liability attaches at entry, liability is not fixed until liquidation, because "[o]nly at *liquidation* is the amount of the debt for duties owed by the importer finally calculated and legally fixed."  *AHAC*, 653 F. Supp. 3d at 1289. Once liquidation does occur, however, whether by an affirmative liquidation or a deemed liquidation, liability has attached and been fixed as against both an importer and their surety. Should the liability not be satisfied at liquidation, CBP may bring a collection action against both the surety and the importer.  "In order to bring a lawsuit on a debt, all that is needed is that the debt exist and that it remain unpaid."  *Id.* at 1290.

### B.    The Customs Bond Program

The customs bond program at issue was created by Kingsway Financial Services, Inc. ("Kingsway"), the ultimate parent of Avalon Risk Management, Inc. ("Avalon Inc.") and Lincoln General Insurance Company ("Lincoln General" or "LGIC").  Avalon Inc. was a customs bond program administrator; LGIC was an insurance carrier that later became a reinsurance carrier to Aegis.  Together, Kingsway, Avalon Inc., and LGIC approached Aegis to secure the bond program at issue because Aegis had all the regulatory authorizations needed to underwrite the program. DSUMF ¶ 13.

During 1998-2008, Aegis acted as the surety for the customs bond program run by Avalon Inc. and reinsured by LGIC.  DSUMF ¶ 14. Aegis provided the necessary licenses and authority for Avalon to distribute and write customs bonds in exchange for a fee.

Avalon Inc. acted as the general agent for customs bonds undertaken by Aegis.  DSUMF ¶ 15.  In that capacity, Avalon administered the program underwritten by Aegis, including underwriting bonds within prescribed authorities, investigating bond principals, dealing with

customs brokers, requiring collateral, charging and collecting premiums, setting rates, receiving and reacting to bills from Customs within delegated authorities and collecting from principals after Aegis incurs a loss.[2]  *Id.*

Aegis was reinsured under two reinsurance treaties.  DSUMF ¶ 17.  The first was with LGIC.  It covered claims for less than $1 million and covered litigation defense costs from disputes involving Customs' claims made on bonds in the program.  The second, an excess of loss treaty, was with General Reinsurance ("GenRe").  It covered claims in excess of $1 million.[3]  Once Aegis extracted its fee for providing the paper on which Avalon wrote its customs bonds, the "risk" and the remainder of the premium went to LGIC.  Because of these reinsurance treaties, Aegis was "a conduit basically providing their paper and their licenses for Avalon to generate a customs bond that was then 100 percent reinsured by another carrier."  *Id.*  Aegis's entire business model was premised on the idea that, if it received a claim under one of the customs bonds, it would be completely covered by LGIC's reinsurance obligations.  *Id*.

LGIC was formally liquidated in 2015.  According to Pennsylvania Court Order of Liquidation entered on November 5, 2015, (i) all LGIC policies or contracts of insurance would terminate no later than 30 days after the Court's order, (ii) all claims under such policies would have to be submitted by July 6, 2016, and (iii) all litigation against LGIC was stayed.  DSUMF ¶ 33.  Until LGIC dissolved, it would have been the entity liable for any claims against the Subject Bond.  Indeed, in addition to the Subject Bond, Aegis underwrote several additional bonds issued

---

[2] In 2009, Avalon Risk Management Insurance Agency ("Avalon LLC") acquired the assets of Avalon Inc.  DSUMF ¶ 16.  In 2019, Avalon Inc. dissolved.  Avalon LLC continued the bond program administration functions of Avalon Inc. under the November 16, 2015 Claims Management Agreement.  *Id.*  Avalon Inc. and Avalon LLC are referred to herein as "Avalon."

[3] Because no losses under the bond program at issue involved GenRe, its excess over loss policy is not relevant to this litigation.

to Presstek.  In fact, between May and June of 2013, when LGIC was still solvent, CBP issued Aegis bills of approximately 12 million dollars based on Presstek entries secured by Aegis's bonds. LGIC prepaid the entire amount to Aegis on March 5, 2013, and June 26, 2013.  DSUMF ¶ 34.

As a consequence of LGIC's liquidation, Aegis sought to enforce certain indemnification rights against Kingsway Financial, LGIC's ultimate parent company, under indemnity and hold harmless agreements Kingsway previously provided to Aegis for certain customs bonds reinsured by LGIC.  DSUMF ¶ 35.  As a result of the uncertainties and costs associated with litigation, Aegis and Kingsway settled that litigation effective January 2020 by Kingsway agreeing to pay Aegis a one-time settlement amount of $0.9 million and to reimburse Aegis for 60 percent of future losses Aegis may sustain in connection with the bonds in the customs bond program.  *Id*.  Future losses include both payments to Customs on the bonds administered by Avalon and out-of-pocket attorneys' fees incurred by Aegis in the investigation, defense, settlement, or mitigation of Customs' claims.  DSUMF ¶ 36  Kingsway's obligation to pay is limited to a maximum amount of $4.8 million and to losses submitted by Aegis through the termination date of the later of June 30, 2025, or five years after Kingsway fully funds the escrow account.  *Id*.  Since then, Kingsway has been paying 60 percent of Aegis's losses, including Aegis's legal fees for the defense of *Aegis I* and this action while Aegis is paying the remainder.  *Id*.

C.    **The Single Transaction Bond At Issue**

During 2003, Avalon was responsible for administering the customs bond program underwritten by Aegis.  Pursuant to the applicable underwriting guidelines, Avalon authorized customs brokers to issue single transaction bonds subject to certain limitations.  The STB at issue was written on October 13, 2002, covered antidumping duties, and had a penal sum of $100,700.00.  Compl. ¶ 7.  Further, although bond applications typically request information from the principal, including the name, address, place of incorporation, principal officers, commodity,

county of origin, estimated value of the merchandise to be imported, and potentially financial statements, Defendant does not have the information from the application because the issuing broker did not provide the bond application to Avalon.  Following issuance of the bond, the issuing broker was responsible for maintaining the principal's bond application and the bond files, however, due to the passage of time, Avalon was unable to procure the bond application.

### D.    The Subject Entry

The merchandise covered by the Subject Entry was honey imported from the PRC.  Compl. ¶ 7.  The Subject Entry was made through the Port of Chicago on or about October 20, 2003.  *Id.* The Entry was subject to an antidumping duty order on honey from the PRC issued by the U.S. Department of Commerce ("Commerce") (A-570-863) (the Honey Order). *See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order; Honey From the People's Republic of China*, 66 Fed. Reg. 63,670 (Dec. 10, 2001).  Compl. ¶ 8.  During this period, the importer did not post cash deposits to secure its antidumping liability. Rather it secured its liability through its sureties, including Aegis, under the then-applicable new shipper bond program administered by Commerce.[4]

---

[4]  As part of the 1993 North American Free Trade Agreement Implementation Act ("NIA") Congress authorized Customs to accept bonds in lieu of cash deposits to secure antidumping liability for new shippers of merchandise covered by an antidumping or countervailing duty order: "[t]he administering authority [*i.e.,* Commerce] shall, at the time a review under this subparagraph is initiated, direct the Customs Service to allow, at the option of the importer, the posting, until the completion of the review, of a bond or security in lieu of a cash deposit for each entry of the subject merchandise."  19 U.S.C. § 1675(a)(2)(B)(iii) (1993).  Congress suspended the New Shipper Bonding Provision during the period April 1, 2006–June 30, 2009, as part of the Pension Protection Act of 2006, Pub. L. No. 109-280, § 1632(a), 120 Stat. 780, 1165.  In March 2016, Congress repealed the New Shipper Bonding Provision effective July 1, 2009, via the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122 (2016).  Customs' regulations implementing the New Shipper Review Bonding Provision mirrored the statute.  19 C.F.R. § 351.214(e).

Aegis became liable to Customs for duties at the time the importation was made. DSUMF ¶ 1. However, because the Subject Entry was subject to antidumping, the Subject Entry was suspended and therefore the liability, though attaching at entry, was not yet fixed.

The suspension of liquidation of the Subject Entry was lifted on September 19, 2008. Compl. ¶ 15. Thereafter, on January 27, 2009, Commerce issued Message No. 9027206, which were liquidation instructions advising Customs that the court-ordered injunction against liquidation of the Subject Entry had dissolved. DSUMF ¶ 25. Aware of the lifting of suspension and Commerce's liquidation instructions which followed, Customs' AD/CVD division, which is tasked with instructing the field to liquidate entries following the lifting of suspension, issued instructions to the field to liquidate all entries subject to Message No. 9027206. DSUMF ¶ 26. On January 27, 2009, the port responsible for the liquidation of the Subject Entry ran a list of all entries that needed to be liquidated as a result of the lifting of suspension. The report included specific entry numbers of entries that needed to be liquidated; that list included the Subject Entry. DSUMF ¶ 27. While the port timely liquidated the other entries on the list, it neglected to liquidate the Subject Entry. DSUMF ¶ 28. Due to the extreme passage of time, Customs is not able to definitively explain why it did not liquidate the Subject Entry pursuant to the AD/CVD division instructions. However, Customs believes it was most likely as a result of its misplacing the entry papers. DSUMF ¶ 29. Because Customs failed to timely liquidate the Subject Entry, it deemed liquidated on March 19, 2009. Compl. ¶ 17.

As with a manual liquidation under 19 U.S.C. § 1500, the deemed liquidation of the Subject Entries was "final and conclusive upon all persons (including the United States and any officer thereof) …." 19 U.S.C. § 1514(a). In other words, following the deemed liquidation, Presstek's

and Aegis's antidumping duty liability was fixed, Customs had no discretion whatsoever to alter the "rate, duty, value, quantity, or amount of duty."  DSUMF ¶ 32.

### E.    Customs' Billing of Aegis

On February 6, 2017, nearly eight years after the Subject Entry deemed liquidated, Customs sent its first bill to Aegis.  Compl. ¶ 23.  Although Customs is not able to definitively determine what caused the exorbitant delay in issuing Aegis the first bill following the deemed liquidation, Customs believes it is most likely due to Customs misplacing and then later locating the entry file.  In any event, the 2017 bill was incorrect, and Customs waited until June 4, 2019, approximately fourteen more months, to issue Aegis a corrected bill.  Compl. ¶ 33.  Customs has no explanation for its fourteen-month delay between issuing the first and second bills to Aegis. DSUMF ¶ 41.

Aegis did not pay the duties at the time of deemed liquidation.  Further, Aegis did not pay the duties in response to either the original or corrected bill because the statute of limitations had long since expired.  The United States commenced the instant action on November 22, 2022, over thirteen years after the deemed liquidation of the Subject Entry.  Dkt. No. 2.  As of the date of the filing of its complaint, Customs alleges that an additional $21,873.89 had accrued in interest. Compl. ¶ 34.

Public Version, Confidential Material Omitted

## II.    STANDARD OF REVIEW

On a motion for summary judgment, the Court determines whether any material facts are in dispute. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). "The court may not resolve or try factual issues on a motion for summary judgment." *Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Trade 1988), *aff'd* 867 F.2d 1404 (Fed. Cir. 1989) (per curiam). No material facts are in dispute that would foreclose summary judgment in Defendant's favor.

## III.    ARGUMENT

This case displays exactly why statutes of limitations are necessary (and the implied contractual requirement of reasonableness exists). Customs commenced an action in an attempt to collect a debt that was nearly 13 years old after having knowingly sat on its rights for more than a decade. Customs' position essentially is that no amount of time can limit its collection actions, that it can wait an unlimited amount of time until billing sureties for owed duties and, at the same time, unilaterally dictate when the statute of limitations will begin running. As discussed below, Customs' position lacks merit.

### A.    The United States' Cause of Action Against The Subject Entries Is Barred By The Six-Year Statute Of Limitations Set Forth In 28 U.S.C. § 2415(a)

The overwhelming weight of authority establishes that the applicable six-year statute of limitations for the United States to file an action to collect on a bond has long since expired. The United States' self-serving arguments to the contrary, and its absurd claim that there is no limit on the time it can wait to bill the surety for duties, which then triggers the statute of limitations, are not legally supportable.

1.    **The statute of limitations accrued on the date of deemed liquidation of the Subject Entry**

The plain language of 28 U.S.C. § 2415(a) controls this case.  Claims brought by the United States must be brought within six years of the date of accrual:

**Time for commencing actions brought by the United States**

[E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues ….

28 U.S.C. § 2415(a).  A cause of action accrues when "all events necessary to fix the liability of a defendant have occurred."  *United States v. Cocoa Berkau, Inc*., 990 F.2d 610, 613 (Fed. Cir. 1993).

In order to commence an action against a surety to collect on a bond, two things must take place: (i) the liability must attach and (ii) the obligation must be fixed and unpaid.  Here, the statute of limitations began to run on March 19, 2009, or at the latest 30 days thereafter, because that is when all events necessary for the United States to commence an action had occurred.

First, Aegis's liability to pay antidumping duties attached at the moment the merchandise covered by the Subject Entry entered the United States, even if those amounts were not yet fixed.  *Thyssenkrupp Steel*, 886 F.3d at 1218; 19 C.F.R. § 141.1(a); DSUMF ¶ 1 (describing entry of goods into the United States as "valid receivables").  Second, the obligation became fixed on March 19, 2009, as a consequence of the deemed liquidation of the Subject Entry.  DSUMF ¶ 32.  At the time of the deemed liquidation, Customs had no authority to alter the amount of antidumping duties for which Aegis was liable.  *See* 19 U.S.C. §§ 1504(d) (providing for the deemed liquidation of entries six months following the lifting of a court-ordered suspension of liquidation); 1514(a) (liquidation is "final and conclusive upon all persons (including the United States and any officer thereof) ….).  Indeed, the Government itself alleges that upon the deemed liquidation of the Subject

Entry, the importer/bond principal became liable to Customs in the amount of $100,634.18. Compl. ¶ 18.  Customs also admits that Aegis became jointly and severally liable at that time. DSUMF ¶ 1.

As soon as the liability became fixed and went unpaid, the Subject Bond was breached because the bond specifically provides that the surety and principal are jointly and severally liable. The United States' cause of action accrued at that point, because it then had the right to file suit to collect the outstanding duties against the importer/bond principal, Defendant, or both.  The United States' cause of action therefore expired by operation of the statute of limitations six years thereafter, that is, on March 19, 2015.

The majority of this Court's precedent supports this conclusion.  As explained above, in *AHAC*, this Court recently held that the date of liquidation or deemed liquidation is the date of accrual for duty claims by the United States.  "The rationale for treating the date of liquidation as the date of accrual of a bond claim is straightforward.  By law, an importer is liable for duties on the merchandise that it imports; this debt for duties attaches at the time of importation."  *AHAC*, 653 F. Supp. 3d at 1289.  The amount of the debt is thereafter fixed upon liquidation or deemed liquidation and is therefore due at that time.

Although *AHAC* is the most recent case to find the statute of limitations accrues at deemed liquidation, it is far from the only case to make such a finding. Indeed, more than eight years ago, this Court issued a similar opinion, which was affirmed *per curiam* by the Federal Circuit:

> Because Customs failed to liquidate within six months after the date of publication of the notices of rescission in the Federal Register, these entries were liquidated by operation of law at the entered rates, **at which time the Government's cause of action on the bonds began to accrue.  Having failed to bring its collection actions within six years of the dates these entries were deemed liquidated, the Government's right to collect any duties from [the importer] … is time-barred**.

**Public Version, Confidential Material Omitted**

*United States v. Am. Home Assurance Co.* (*AHAC 2016*), 151 F. Supp. 3d 1328, 1342-43 (Ct. Int'l Trade 2016) (emphasis added), *as amended* (Mar. 15, 2016), *aff'd* 776 F. App'x 707 (Fed. Cir. 2019) (per curiam).  *See also United States v. Int'l Fid. Ins. Co.*, 273 F. Supp. 3d 1170, 1177 (Ct. Int'l Trade 2017) ("When liquidation occurs by operation of law, the six-year statute of limitations commences on the date of the deemed liquidation"); *United States v. Great Am. Ins. Co.*, 791 F. Supp. 2d 1337, 1367-68 (Ct. Int'l Trade 2011) ("The Government's cause of action accrued six months after publication of the Notice of Rescission when the [importer's] Entries [were] deemed liquidated [by operation of law] and the Government's right to collect additional duties attached." (emphasis omitted)).

The United States' representations to this Court and Customs' representations to the importing community confirmed this point.  *See United States v. Am. Home Assurance Co.*, 35 C.I.T. 585, 588 (2011) (reporting that the United States had "agree[d] that the statute of limitations on the Government's claims runs from the date of liquidation").  *See also Application for Further Review of Protest No. 5201-13-100147*, No. HQ H249804, 2017 U.S. Custom HQ Lexis 1211, at *8 (Cust. B. & Dec. Apr. 3, 2017) ("HQ H249804") (asserting that Customs "right of action against a surety accrues within six years of the thirtieth day after liquidation 'regardless of whether an importer's or surety's protest deprives the assessment of duties of its final effect'" (quoting *United States v. Ataka Am., Inc.*, 826 F. Supp. 495, 503 (Ct. Int'l Trade 1993)).

Notwithstanding these representations, the United States now contends that Customs' issuance of a bill to Defendant was a necessary predicate to the accrual of the United States' cause of action and caused the statute of limitations to begin to run, regardless of the amount of time elapsed between liquidation and issuance of a bill.  But Customs' bill has nothing to do with the establishment of Defendant's liability.  *See Cocoa Berkau, Inc.*, 990 F.2d at 614 ("[t]he accrual of

a right of action should occur upon default by a liable party, not when a creditor takes steps to procure performance"). As described above, Defendant's liability was established at the time of importation, and the amount of that liability was fixed at the time of deemed liquidation. Neither the value of the merchandise covered by the Subject Bond nor Presstek's rate changed from the time of entry through the time of deemed liquidation. And when Customs failed to liquidate the Subject Entry within six months, the Subject Entry was liquidated by operation of law at the cash deposit rate Presstek asserted at the time of entry. The only purpose of Customs' demand, therefore, was to open the window for interest-free payment by the importer and, failing payment, to start interest to accrue, measured from the date of liquidation. 19 U.S.C. § 1505(b), (d). Nothing about Customs' demand affected the accrual of the United States' claim for duties.

The Federal Circuit also has held in at least two cases that the United States' cause of action accrued without the issuance of a bill for collection. In *Cocoa Berkau*, Customs' demand on the importer for redelivery of merchandise triggered the importer's and surety's breach and the accrual of the United States' cause of action, not its subsequent bill for payment on the surety. *Cocoa Berkau*, 990 F.2d at 613-14. In *United States v. Commodities Export Co.*, Customs's demand for payment had nothing to do with the accrual of United States' cause of action. The Federal Circuit held that Customs' inspection of the importer's warehouse started the United States' cause of action to accrue in a cause of action to collect liquidated damages for mismarked warehouse entries. *United States v. Commodities Export Co.*, 972 F.2d 1266, 1272 (Fed. Cir. 1992).

The United States' argument that Customs' demand is a necessary precursor to suit is also contrary to highly analogous case law regarding liquidation. In *International Trading II*, the Federal Circuit addressed whether the Federal Register notice announcing the termination of

suspension of liquidation or Commerce's liquidation instructions to Customs started the six-month

deemed liquidation statute to commence:

> Moreover, the date of publication provides an unambiguous and public starting point for the six-month liquidation period, and it does not give the government the ability to postpone indefinitely the removal of suspension of liquidation (and thus the date by which liquidation must be completed) as would be the case if the six-month liquidation period did not begin to run until Commerce sent a message to Customs advising of the removal of the suspension of liquidation. Beyond that, treating the date of notification as separate from the date of publication could lead to messy factual disputes about when Customs actually received notice of the removal of the suspension of liquidation.

*Int'l Trading Co. v. United States* (*Int'l Trading II*), 281 F.3d 1268, 1275 (Fed. Cir. 2002).

In *International Trading III,* the Federal Circuit revisited *International Trading II* in light

of the 1993 amendment adding 19 U.S.C. § 1675(a)(3)(B) to the statute, which directed Customs

to liquidate entries "promptly and, to the greatest extent practicable, within 90 days after the

instructions to Customs are issued" and correspondingly amending 19 U.S.C. § 1504(d) to create

an exception for section 1675(a)(3)(B). The Federal Circuit confirmed its earlier ruling in

*International Trading II. Int'l Trading Co. v. United States* (*Int'l Trading III*), 412 F.3d 1303,

1313 (Fed. Cir. 2005) ("[w]e think it unlikely that Congress would have undone the primary

objective of the 1993 amendment to section 1504(d) by removing time limits already present in

the law, without any indication in the legislative history that such a substantive change was being

made").

These holdings make clear that Customs' administrative demand is not a precursor to suit.

Just like *International Trading II*, tying the commencement of the United States' cause of action

to deemed liquidation, which is triggered by a Federal Register notice removing the suspension of

liquidation of entries covered by an administrative review, provides an "unambiguous and public

starting point" for the six-year statute of limitations to run on Customs' action to collect against

sureties. *Id.* at 1308 (quoting *Int'l Trading II*, 281 F.3d at 1275). It deprives "the government [of]

the ability to postpone indefinitely" the commencement of the United States' cause of action "and thus the date by which [the collection action] … must be [commenced]" by withholding the demand. *Id.* (quoting *Int'l Trading II*, 281 F.3d at 1275). It also would avoid "messy factual disputes" about when Customs made its demand and whether the importer failed to pay. *Id.* (quoting *Int'l Trading II*, 281 F.3d at 1275). Accordingly, just like Commerce's liquidation instructions in *International Trading II* and *International Trading III*, Customs' bill in this case is an administrative step designed to complete the liquidation and collection process, but has nothing to do with the commencement of the statute of limitations.

Finally, the United States' own litigation practices make clear that it does not consider an antecedent demand for payment to be necessary for the accrual of the United States' cause of action. In at least four cases, the United States did not issue a bill before seeking to collect duties against importers under 19 U.S.C. § 1505(b). In *Maple Leaf Marketing, Inc. v. United States*, No. 20-03839 (Ct. Int'l Trade Jan. 20, 2023), Dkt. No. 21 (Government's answer and counterclaim), for example, the importer filed an action under 28 U.S.C. § 1581(a) challenging Customs' denial of its protest. The United States then asserted a counterclaim under 28 U.S.C. § 1582—the same jurisdictional statute alleged in this case—challenging Customs' own classification determination in favor of a classification that resulted in a higher rate of duty and, in the process, sought an order compelling the importer to pay additional duties. Nothing in the counterclaim alleged that Customs first sent the importer a bill. *See also Second Nature Designs Ltd. v. United States*, No. 18-00131 (Ct. Int'l Trade Feb. 14, 2023), Dkt. No. 29 (same); *Cyber Power Sys. (USA) Inc. v. United States*, 586 F. Supp. 3d 1325, 1330-34 (Ct. Int'l Trade 2022) (denying the United States' motion to amend its complaint to add a similar counterclaim for failure to state a claim upon which relief can be granted and re-denominating the counterclaim as an affirmative defense); *Second*

*Nature Designs, Ltd. v. United States*, 586 F. Supp. 3d 1334, 1338, 1342 (Ct. Int'l Trade 2022) (same).  The United States' filing of counterclaims in these cases to collect duties without an antecedent administrative demand makes clear that demand is merely an administrative step, not one that starts the statute of limitations to commence. Put differently, Customs' demand can be its complaint, and its complaint can be its demand.

### 2.    Section 1505(b) does not mandate that the United States' claims accrue upon demand by Customs

As noted above, the *Aegis I* Court found that the statute of limitations to collect on a bond did not commence until CBP issued its first bill.  The *Aegis I* Court largely based its decision on the language of 19 U.S.C. § 1505(b), explaining that "[t]he critical language states that the duties 'are due *30 days after the issuance of the bill*[.]"  693 F. Supp. 3d at 1337 (emphasis in original).  Based on this language, the *Aegis I* Court determined that one of the events necessary to commence—namely the breach of the bond—did not occur until after a bill was issued.  As discussed below, we believe *Aegis I* to be incorrect.

First, nothing in the language of Section 1505(b) changes the time of accrual for purposes of the statute of limitations.  The plain language of 19 U.S.C. § 1505(b) itself does not require a demand for payment before Customs' cause of action accrues for collecting duties on entries liquidated under the deemed liquidation statute:

> **(b) Collection or refund of duties, fees, and interest due upon liquidation or reliquidation**
>
> The Customs Service shall collect *any increased or additional duties and fees due, together with interest thereon*, or refund any excess moneys deposited, together with interest thereon, *as determined on a liquidation or reliquidation*.  Duties, fees, and interest determined to be *due upon liquidation or reliquidation* are due 30 days after issuance of the bill for such payment.  Refunds of excess moneys deposited, together with interest thereon, shall be paid within 30 days of *liquidation or reliquidation.*

19 U.S.C. § 1505(b) (emphasis supplied).  According to the first sentence of Section 1505(b), duty liability is "***determined on a liquidation or reliquidation***."  The third sentence of Section 1505(b) makes the point that refunds shall be paid within 30 days of "***liquidation or reliquidation.***"  Even the statutory language relied upon by Customs in the second sentence makes clear that duties are "***determined to be due upon liquidation,***" in this case, by deemed liquidation.  In all instances, the event of liquidation or reliquidation, not a demand by Customs, establishes the importer's and surety's liability for duties (and Customs' liability for refunds).  Indeed, the words "breach" and "demand"—the events the United States identifies as the commencement of the statute of limitations—do not even appear in Section 1505(b).  And as the *AHAC* court put it, the second part of the second sentence merely serves to notify importers of the amount owed.  653 F. Supp. 3d at 1291 n.20.

Second, to reinforce the point, Congress used the mandatory term "shall" in Section 1505(b) solely in connection with Customs' duty to collect interest and its duty to refund excess moneys deposited "***as determined on a liquidation or reliquidation***."  The mandatory "shall" is not used in connection with Customs' issuance of a bill.  Indeed, nothing in Section 1505(b) even requires Customs to send a bill.  Section 1505(b) therefore allows for the collection of duties and interest thirty days after billing the duties ***determined to be due on liquidation***, but does not create a new cause of action for the collection of liquidated duties at the time of Customs' later ministerial "demand" for payment.  Although billing may be a self-imposed prerequisite to collecting interest on any duties determined to be due on liquidation, no statute or regulation holds that billing is a prerequisite to filing a suit for collection of the actual duties determined to be due on liquidation.

Third, the collection statute, 19 U.S.C. § 1505, was never amended for the purpose of expanding Customs' authority to delay the collection of duties assessed on liquidation of the

entries under the liquidation statute, 19 U.S.C. § 1504. The 1984 and 1993 amendments to the collection statute, 19 U.S.C. § 1505(b), were enacted for no purpose other than to set the moment in time when duties became delinquent for the purpose of calculating the amount of remedial interest due under Section 1505(c).[5] In particular, the 1993 amendment makes clear that Congress intended to provide the importer with a 30-day grace period for the payment of bills without interest (and to mandate the payment of interest after the expiration of the 30-day period). The amendment also provided a 30-day deadline for Customs to make refunds with interest. The legislative history to the 1993 amendment makes clear that Congress intended to "provide equity in the collection and refund of duties and taxes, together with interest, by treating collections and refunds equally," not to indefinitely extend the liability of the importer or surety until such time as Customs issued a bill. H.R. Rep. No. 103-361, pt. 1, at 140 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 2552, 2690.

Fourth, if the text of Section 1505(b) were not conclusive—which it is—Section 1505(d) leaves no doubt that duties are due, and the United States' cause of action against a surety to collect them accrues, upon liquidation or reliquidation, not upon Customs' demand:

**(d) Delinquency**

If duties, fees, and interest determined to be due or refunded are not paid in full within the 30-day period specified in subsection (b), any unpaid balance shall be considered delinquent and bear interest by 30-day periods, at a rate determined by the Secretary, ***from the date of liquidation or reliquidation until the full balance is paid.*** No interest shall accrue during the 30-day period in which payment is actually made.

---

[5] *See* H.R. Rep. No. 98-1015, at 67-68 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 4960, 5026-27 ("Without legislation to overturn the *Heraeus* decision and with the current high interest rates prevailing throughout the country, it is anticipated that any normal business entity, legally able to delay payment of large sums of money without interest, would take advantage of that opportunity.").

**Public Version, Confidential Material Omitted**

19 U.S.C. § 1505(d) (emphasis supplied).  This provision reflects that fact that the importer's and surety's liability is fixed at the time of liquidation.  *Thyssenkrupp Steel*, 886 F.3d at 1218 (citing 19 C.F.R. § 141.1(a)).  If Customs were correct that importers and sureties owe nothing until a demand is made—which it is not—then the statute would say that interest starts running from the date of Customs' demand on the principal.  The statute would not say that interest runs on unpaid balances from the date of liquidation or reliquidation.  Otherwise, Customs could run up interest in perpetuity on outstanding antidumping duties by the mere expedient of not issuing a bill.

The United States is likely to point out that interest does not accrue if an importer pays the bill within 30 days of issuance.  But this argument does nothing to change the fact that, when Customs' bill to the importer goes unpaid for 30 days, interest accrues from the date of liquidation or deemed liquidation.  It may be true that importers can avoid interest from accruing upon liquidation or reliquidation by paying their bills within the "30-day period specified in subsection (b)," but it is not true for sureties, and certainly not for the Defendant in this case.  Under Customs' own regulations, billing against the importers and sureties is staggered:

> (d) Notice—
>
>   (1) Principal.  The principal will be notified at the time of the initial billing, and every 30 days after the due date until the bill is paid or otherwise closed.
>
>   * * *
>
>   (2) Surety.
>
>   (i) CBP will report outstanding bills on a Formal Demand on Surety for Payment of Delinquent Amounts Due, for bills more than 30 days past due (approximately 60 days after bill due date), and every month thereafter until the bill is paid or otherwise closed.

19 C.F.R. § 24.3a(d)(1)-(2).  Accordingly, interest in actions against sureties will always accrue from the date of liquidation or reliquidation.  And if interest against the surety accrues upon liquidation or reliquidation, so too does the United States' cause of action.

### 3. The Court must read the assessment, liquidation, and collection statutes in *pari materia*

It is an elementary canon of construction that a statutory provision should be interpreted consistent with the "structure of [the statute] as a whole." *Dep't of Revenue v. AFC Indus., Inc.*, 510 U.S. 332, 340-41 (1994) (citing *Mountain States Tel. & Tel. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985)).   The terms of a statute cannot be read in a vacuum.  *See FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000) ("[i]t is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme,'" (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  "A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'"  *Id*. (quoting *Gustafson v. Alloyd Co*., 513 U.S. 561, 569 (1995) & *FTC v. Mandel Bros.*, 359 U.S. 385, 389 (1959)).

To make sense of the statutory scheme for the assessment, liquidation, and collection of duties and interest against sureties, Customs' cause of action must accrue upon the event of liquidation. The United States' contrary interpretation is inconsistent with the legislative history to both Section 1505(b) and the deemed liquidation statute, 19 U.S.C. § 1504.  The 1978 and 1993 amendments to Section 504 of the Tariff Act (19 U.S.C. § 1504) created a statutory scheme to protect importers and their sureties from undue delay in the liquidation of their entries by placing strict limits on the amount of time that Customs could take to liquidate an entry and subject importers and sureties to liability.  As explained by the Federal Circuit in *United States v. Cherry Hill Textiles, Inc.,* the legislative history to the 1978 amendment advised that "[t]he 'deemed liquidated' provision … was added to the customs laws in 1978 to place a limit on the period within which importers and sureties would be subject to the prospect of liability for a customs entry."  112 F.3d 1550, 1559 (Fed. Cir. 1997).  *See* Customs Procedural Reform and Simplification

Public Version, Confidential Material Omitted

Act of 1978, Pub. L. No. 95-410, § 209(b), 92 Stat. 888, 903.  The purpose of the provision was to give importers finality as to their duty obligations by providing for deemed liquidation at the rate claimed by the importers, unless actual liquidation occurred within specified time limits.  *See Int'l Trading II*, 281 F.3d at 1272.  Because Congress curtailed the authority of Customs to exercise the seminal task of liquidation in the 1978 and 1993 amendments to Section 504, there is simply no rational argument that Congress intentionally undid that schema by amending one sentence of Section 1505(b).  Indeed, it strains credulity to believe that, after Congress had so carefully placed time limitations on the liquidation of entries to "protect importers and their sureties," that it would enact a provision that would allow Customs to then unilaterally extend without limitation the period to bill and collect duties from the surety on the deemed liquidated entries.  In the words of the Federal Circuit, "[w]e think it unlikely that Congress would have undone the primary objective of the 1993 amendment to section 1504(d) by removing time limits already present in the law, without any indication in the legislative history that such a substantive change was being made."  *Int'l Trading III*, 412 F.3d at 1313.

### 4. The "pay, as demanded," language in the Subject Bond makes clear that the United States' cause of action accrued upon deemed liquidation

The Subject Bond incorporates language from Customs' regulations, which require the surety to "[p]ay, as demanded by [Customs], all additional duties, taxes, and charges subsequently found due, legally fixed, and imported on any entry secured by this bond."  19 C.F.R. § 113.62. But just as section 1505(b) does not make Customs' demand a mandatory precondition to the accrual of the United States' cause of action or allow Customs to postpone the statute of limitations period from running, neither does the bond language.  Rather, liquidation is the event that "fixes" liability and enables collection, thus starting the statute of limitations running.  Custom's ministerial demand per the bond can do nothing to change Customs decisions as to "charges or

exactions" or liquidation once the period for filing a protest or appealing a denial of a protest has expired. *See* 19 U.S.C. §§ 1504(d), 1514; *Mitsubishi Elecs. Am., Inc. v. United States*, 44 F.3d 973, 976-77 (Fed. Cir. 1994). As such, Customs' demand is insufficient to postpone the commencement of the United States' cause of action. *See United States v. Ins. Co. of N. Am.*, 83 F.3d 1507, 1510 (D.C. Cir. 1996) (where "a call for performance is not an essential element of the cause of action, the running of the statute does not await a demand." (quoting *Nyhus v. Travel Mgmt. Corp.*, 466 F.2d 440, 452-53 (D.C. Cir. 1972)), *as amended* (June 19, 1996); *Cocoa Berkau*, 990 F.2d at 613-14 (holding that non-mandatory bond language regarding Customs' demand—the surety "shall pay to [Customs] such amounts as liquidated damages *as may be demanded*"—was insufficient to establish Customs' demand for payment as the trigger for the surety's breach and the United States' cause of action (emphasis supplied)). Indeed, the Federal Circuit held that Customs' demand for payment of liquidated damages on the surety in *Cocoa Berkau* "***was merely a procedural step for obtaining the damages and did not in itself create liability***." 990 F.2d t 614 (emphasis supplied). Customs' "demand" for payment per the bond language in this case similarly was merely a procedural step for collecting duties and did not in itself create liability.

The Federal Circuit's decision in *United States v. Commodities Export Co.*, 972 F.2d 1266, further supports Defendant's position. In that case, the Federal Circuit held that Customs' internal procedures allowing the importer to petition for relief from liquidated damages, when imposed by Customs on itself, did not delay the accrual date for the United States' cause of action. *Id.* at 1271. Similar to *Commodities Export*, Customs unilaterally promulgated a regulation—19 C.F.R. § 113.62(a)(1)(ii)—that obligates it to make a demand on the surety for payment when the bill goes unpaid by the importer for more than 30 days. Although this regulation is incorporated into the Subject Bond, it does not state that the commencement of the statute of limitations period is

Public Version, Confidential Material Omitted

postponed until after Customs makes its demand and does not get paid.  Indeed, Customs could have written its regulation any way that suited its purposes, including for example, stating that a demand and failure to pay were necessary predicates to a collection action, and those regulations would have been incorporated into the Subject Bond just as section 113.62(a)(1)(ii) is incorporated by reference.  If Customs had written its regulation in that manner, the courts would give it effect. *See Commodities Exp.*, 972 F.2d at 1271 ("Where the parties had agreed in advance to a condition on the filing of a suit, the Supreme Court gave effect to that agreement by delaying [the] accrual of the right of action.").

Also like *Commodities Export*, no statute requires Customs to give notice of a demand for duties owed resulting from a deemed liquidation.  Indeed, Section 1505(b) does not make demand mandatory.  Moreover, the deemed liquidation statute expressly relieves Customs from providing any notice of deemed liquidation.  *See* 19 U.S.C. § 1504(a)(1) ("notwithstanding section 1500(e) of this title [addressing active liquidations] notice of [deemed] liquidation need not be given of an entry deemed liquidated").   Rather, Customs' demand-and-wait procedure is a unilaterally imposed obligation, just like the one that *Commodities Export* found not to postpone the six-year statute of limitations period in 28 U.S.C. § 2415(a).

**B.    The United States Cannot Recover Under The Bond Because It Failed To Issue Its Bill Within A Reasonable Amount of Time Following Liquidation**

Even if the instant action were not time barred by the six-year statute of limitations - which it is - summary judgment still should be entered in Defendant's favor because Customs failed to issue its bill within a reasonable amount of time following the deemed liquidation.

Customs bonds are at their core, contracts.  As explained in *Aegis I*, "[c]ontracts with a demand requirement and no express limitation on the time demand contain an implied reasonable

**Public Version, Confidential Material Omitted**

time requirement: The party required to make demand must do so within a reasonable time."[6] *Aegis I*, 693 F. Supp. 3d at 1338. "Implied contractual duties—like other ordinary principles of contract law—apply when the United States contracts with private parties." *Id.* at 1339.

Case law makes clear that Customs' demand must be made within a reasonable time. *Nyhus,* 466 F.2d at 452-53 ("To be sure, a party is not at liberty to stave off operation of the statute inordinately by failing to make demand; when statutorily unstipulated, the time for demand is ordinarily a reasonable time" (footnote omitted)); *Commodities Exp.*, 972 F.2d at 1271 ("This court cannot, however, permit a single party to postpone unilaterally and indefinitely the running of the statute of limitations"); *Curry v. United States*, 679 F. Supp. 966, 970 (N.D. Cal. 1987) (holding that the Small Business Administration's failure to declare a note in default for six years was unreasonable and caused the SBA's cause of action to be barred by the statute of limitations in 28 U.S.C. § 2415(a)).[7]

---

[6] In *Aegis I* the Government conceded in open court that the implied contractual term of reasonableness applies to the government and customs bonds:

> THE COURT: So just to clarify, the Government does not dispute that the implied reasonableness contractual term applies to it. Its dispute is what the time period we're looking at to determine whether it is reasonable.

> [COUNSEL FOR THE UNITED STATES]: Right….

Nov. 15, 2023 Hearing Tr. at 57:16-20, *Aegis*, No. 20-3628 (Ct. Int'l Trade), Dkt. No. 128. Although the Government tried to recant in a later filed motion for reconsideration, the *Aegis I* Court denied the Government's motion.

[7] *See also United States v. Gottleib*, 948 F.2d 1128, 1131 (9th Cir. 1991) (acknowledging the requirement that the government make demand on defaulting parties within a "reasonable" time when demand is necessary to the accrual of the government's cause of action); *United States v. Vanornum,* 912 F.2d 1023, 1027 n.5 (8th Cir. 1990) (same); *United States v. Rollinson*, 866 F.2d 1463, 1468 (D.C. Cir. 1989) (same); *United States v. Gordon,* No. 90 Civ 4016, 1994 WL 514533, at *5-6 (S.D.N.Y. Sept. 21, 1994) (same).

Customs' own policies and procedures define what is a reasonable time to make a demand. Customs admits that early demand is a "cardinal rule" of debt collection. DSUMF ¶ 7. According to its internal policies and procedures:



*Id.* Consistent with this universal business axiom, Customs' policy is to ensure that

*Id.* ¶ 8.

Customs unquestionably failed to make demand within a reasonable amount of time following deemed liquidation—measured by its own policies, case law, the prejudice to Aegis, or even common sense. The Subject Entry deemed liquidated on March 19, 2009, but Customs did not send Aegis its first (albeit erroneous) bill until February 6, 2017, nearly eight years later. It then waited another two years and four months to issue a subsequent (but still incorrect) bill on June 4, 2019. DSUMF ¶ 41. In total, it took Customs more than a decade from liquidation to issue the bill on which it now seeks to collect. This interval is much longer than Customs' own policies allow, almost twice as long as the six-year statute of limitations period some courts have found to define the outer bounds of reasonableness,[8] far longer than the parties' expectations,[9] and longer

---

[8] In *United States v. Gordon,* 78 F.3d 781, 786 (2d Cir. 1996), for example, the court held that "a delay … that does not exceed the applicable [statute of] limitations period is ordinarily regarded as reasonable."

[9] *See, e.g., Nyhus*, 466 F.2d at 453 ("reasonable[ness] … is a matter of the parties' expectations"). Here, the parties' expectations were expressed by (i) Customs' representations as set forth in litigation positions taken in this Court and ruling letters issued to the importing community, *infra* § III.C.I., and (ii) the surety industry's expectations as expressed in the declaration of James Zuhlke, *infra* § III.C.1. and DSUMF ¶¶ 43-44.

than the 8.5-year interval between deemed liquidation and demand that this Court found to be unreasonable in *Aegis I.*

Customs' delay is all the more egregious because there is no excuse for it. Customs received notice of the lifting of suspension of the Subject Entry, admitted that it had received Commerce's liquidation instructions, and even issued internal instructions to liquidate the Subject Entry prior to the it becoming deemed liquidated. DSUMF ¶¶ 24-28. Customs even admits that its handling of the Subject Entry was "inconsistent" with its policies. DSUMF ¶ 29. Customs' only explanation is that the Subject Entry papers were likely misplaced for several years, and Customs never attempted to reconstruct the Subject Entry. DSUMF ¶ 30. Like in *Aegis I* "[r]egardless of how one measures reasonableness, the delay here was unreasonable." 693 F. Supp. 3d at 1339. Because it failed to issue the bill underlying this matter in a reasonable amount of time, Customs breached the bond contract and cannot now recover.

Finally, Customs' delay is unreasonable because it resulted in significant prejudice to Aegis. Notably, prejudice can be presumed from Customs' ten-year delay alone. *See, e.g., Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 43 (2d Cir. 1982) ("[p]rejudice to defendants resulting from unreasonable delay may be presumed") (citing *Citizens Utils. Co. v. Am. Tel. & Tel. Co.,* 595 F.2d 1171, 1174 (9th Cir. 1979)). Even if prejudice is not presumed, however, Aegis has demonstrated that it has suffered actual harm arising from the United States' delay in bringing its claims. As described above, had Customs acted timely, Aegis would have been reimbursed by LGIC for 100 percent of the duties sought by Customs and would not have incurred a cent in legal fees in the defense of this action. DSUMF ¶¶ 33-37. Specifically, had Customs followed its own internal process, it would have issued its bill 30 days after the deemed liquidation of the Subject Entry on March 19, 2009. A bill issued in 2009 would have been issued long before LGIC's

liquidation in 2015.  And if there were any doubt as to LGIC's ability to pay Aegis's losses on the Subject Entry in 2009, that doubt can be alleviated by the simple observation that LGIC reimbursed Aegis more than $12 million in other Presstek liabilities in 2013.  DSUMF ¶ 34.  Instead, Customs did not issue its first bill until February 6, 2017, well after LGIC's insolvency in November 2015. DSUMF ¶¶ 33, 39.

Next, Customs' more than eight-year delay in billing also caused the unnecessary accrual of interest under 19 U.S.C. § 1505(b) and (d).  Under 19 U.S.C. § 1505(b), interest accrues from the date of liquidation, *i.e.,* March 19, 2009, unless the importer pays within 30 days.  The unjustified delay directly causing the substantial accrual of interest unilaterally increased surety's risk of loss and unnecessarily caused surety's exposure to an actual loss not contemplated by any party to the subject bond.  Moreover, under 19 U.S.C. § 580, the amount of interest is not capped by the bond limits, provided that the United States files suit to collect.  As a result, the United States' demand for interest under section 580 prejudices Aegis because it forces Aegis to risk incurring liability for significant, uncapped interest in order to defend itself in court.

### C.    The United States' Cause Of Action Is Barred By The Doctrine Of Impairment Of Suretyship

Summary judgment also should be entered for Defendant because Customs' actions, or lack thereof, impaired Aegis' suretyship status.  The Federal Circuit looks to the Restatement (Third) of Suretyship and Guaranty (1996) (the "Restatement") to examine the rights and responsibilities of the obligee (Customs), the principal obligor (Presstek, the importer) and the secondary obligor (Aegis, the surety) under a given customs bond.  *United States v. Great Am. Ins. Co*., 738 F.3d 1320, 1332 (Fed. Cir. 2013).  The Restatement defines the impairment of suretyship defense as follows:

> If the obligee acts to increase the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the

> principal obligor to bear the cost of performance, the secondary obligor is
> discharged as described in subsections (2) and (3) ….  An act that increases the
> secondary obligor's risk of loss by increasing its potential cost of performance or
> decreasing its potential ability to cause the principal obligor to bear the cost of
> performance is an "impairment of suretyship status."

Restatement § 37(1).  *See also Great Am. Ins. Co.*, 738 F.3d at 1332.  "Modification need not be

accomplished by changes in the language of the instrument[,] but may be by material departures

from its terms in its execution and enforcement."  *Old Republic Ins. Co. v. United States,* 645 F.

Supp. 943, 955 (Ct. Int'l Trade 1986) (quoting *St. Petersburg Bank & Tr. Co. v. Boutin*, 445 F.2d

1028, 1031 (5th Cir. 1971)).

"This Restatement adopts a bifurcated approach to impairments of the secondary obligor's

suretyship status."  Restatement § 37, cmt. *a*.  "When the impairment fundamentally alters the risks

imposed on the secondary obligor, the resulting situation is no longer that for which the secondary

obligor bargained.  Accordingly, the secondary obligor is discharged from its obligation."  *Id*.

Thus, under the "fundamental alteration" approach:

> (2)    If the obligee fundamentally alters the risks imposed on the secondary
> obligor by: …
>
>> (b)    agreeing to a modification of the duties of the principal obligor that
>> either amounts to a substituted contract or imposes risks on the
>> secondary obligor fundamentally different from those imposed on
>> the secondary obligor prior to modification (§ 41(b)(i)).
>
> The secondary obligor is discharged from ***any unperformed portion*** of the
> secondary obligation as more fully set forth in these sections.

Restatement § 37(2)(b) (emphasis supplied).  *See also Great Am. Ins. Co.,* 738 F.3d at 1332;

*Hartford Fire Ins. Co. v United States*, 772 F.3d 1281, 1288 (Fed. Cir. 2014).

Similarly, under Restatement Section 41(b)(i):

If the principal obligor and the obligee agree to a modification, other than an
extension of time or a complete or partial release, of the principal obligor's duties
pursuant to the underlying obligation:

(b)    the secondary obligor is discharged from ***any unperformed duties*** pursuant to the secondary obligation:

    (i)    if the modification creates a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed pursuant to the transaction prior to modification.

Restatement § 41(b)(i) (emphasis supplied).  *See also Nat'l Sur. Corp. v. United States,* 118 F.3d 1542, 1544 (Fed. Cir. 1997) ("The surety bond embodies the principle that any material change in the bonded contract that increases the surety's risk or obligation without the surety's consent, affects the surety relationship," and that "'the compensated surety is … discharged if the modification materially increases his risk.'" (quoting *Gritz Harvestore, Inc. v. A.O. Smith Harvestore Prods. Inc*., 769 F.2d 1225, 1230 n.7 (7th Cir. 1985) (quoting Restatement (First) Security § 128 (1941)), *as amended on denial of reh'g* (Oct. 31, 1985).

By contrast, under the "loss of recourse" approach:

(3)    [i]f the obligee impairs the secondary obligor's recourse against the principal obligor by …

    (f)    any other act or omission that impairs the principal obligor's duty of performance … or the secondary obligor's right of restitution or subrogation (§ 44);

the secondary obligor is discharged from its duties pursuant to the secondary obligation to the extent set forth in those sections in order to prevent the impairment of recourse from causing the secondary obligor a loss.

Restatement § 37(3)(f).

Under Section 44 of the Restatement:

If otherwise than described in §§ 39-44, the obligee impairs the principal obligor's duty of performance (§ 21), … or the secondary obligor's right of restitution (§ 26) or subrogation (§§ 27-31), the secondary obligor is discharged from its duties pursuant to the secondary obligation ***to the extent that such impairment would otherwise cause the secondary obligor a loss.***

Restatement § 44 (emphasis supplied).  *Hartford Fire Ins. Co. v. United States*, 254 F. Supp. 3d 1333, 1365 (Ct. Int'l Trade 2017).

Under both approaches, Defendant bears the burden of persuasion with respect to its impairment of suretyship defense.  *See* Restatement § 49 & cmts. *a*, *b*.  As discussed below, CBP has impaired Aegis suretyship in two ways.

> **1.    Customs impaired Defendant's suretyship status by fundamentally altering the parties' rights and obligations under the Subject Bond**

When Aegis issued and Customs approved the Subject Bond, they did so against a well settled understanding that the six-year statute of limitations to collect duties against the surety commenced upon the liquidation of the Subject Entries.  This understanding was expressed in statements Customs made to this Court in previous litigations.  *See Am. Home Assurance Co.*, 35 C.I.T. at 588 (reporting that the United States had "agree[d] that the statute of limitations on the Government's claims runs from the date of liquidation").  It also was expressed in a Customs Headquarters ruling letter.  *See* HQ H249804, 2017 U.S. Custom HQ Lexis 1211, at *8 (asserting that Customs "right of action against a surety accrues within six years of the thirtieth day after liquidation 'regardless of whether an importer's or surety's protest deprives the assessment of its final effect.'" (quoting *Ataka Am.*, 826 F. Supp. at 503).  This was the surety industry's understanding as well.  According to James Zuhlke, Executive Chairman of Avalon Risk Management Insurance Agency, the successor to Defendant's claims agent:

> During the last 40 years, we and all our competitors have operated our surety businesses on a Customs administrative process that may be defined with liability beginning with the filing of an entry, finality coming with the liquidation of the entry, and collection following within a reasonable time after liquidation with the statute of limitations for collection of the debt expiring six years following liquidation.  The several customs statutes read in conjunction with one another support this process.  The court cases on point have supported this process holding that liquidation initiates the running of the statute….  [O]ur surety business procedures and risk analysis rely upon that Customs process. Notwithstanding the industry's reliance on the process, CBP gave the surety industry no notice

whatsoever of its policy shift to base the running of the statute of limitations from the date of liquidation to the date of its billing.

DSUMF ¶ 43.[10]  Mr. Zuhlke's testimony is unrebutted.

Long after the Subject Bond was issued, through the filing of *AHAC, Aegis I*, and the current action, Customs announced a policy change with respect to when causes of action accrued, which change modified the rights and responsibilities of all parties to the Subject Bond.  Under its modification, Customs has now unilaterally given itself indefinite time to collect duties against a surety merely by withholding its bill.  According to Customs, nothing—prejudice or otherwise— limits the length of time it can withhold its demand or sue the surety.  Thereby, the surety, without its consent, has become jointly and severally liable for duties for an indefinite period of time despite the otherwise applicable statute of limitations.  The importer now has the financial backing of the surety in perpetuity; in the past, it became solely responsible for the payment of duties after the expiration of the six-year statute of limitations against the surety, as no statute of limitations protects the importer.  *See Ataka Am.*, 826 F. Supp. at 497-98.

Customs' modification of the Subject Bond and concomitant delay in issuing a bill "impose[d] [material] risks on [Defendant,] … fundamentally different from those imposed pursuant to the transaction prior to modification."  Restatement § 41(b)(i).

---

[10] Decisions of this Court also informed the party's understanding. *See, e.g.*, *AHAC 2016*, 151 F. Supp. 3d at 1342-43 (identifying deemed liquidation as the event giving rise to the accrual of the United States' cause of action); *Int'l Fid. Ins. Co.*, 273 F. Supp. 3d at 1177 ("When liquidation occurs by operation of law, the six-year statute of limitations commences on the date of the deemed liquidation"); *Great Am. Ins. Co.*, 791 F. Supp. 2d at 1367-68 ("The Government's cause of action accrued six months after publication of the *Notice of Rescission* when the [importer's] Entries [were] deemed liquidated [by operation of law] and the Government's right to collect additional duties attached.").

Public Version, Confidential Material Omitted

### 2. Customs impaired Defendant's suretyship status by depriving Defendant of recourse

Customs also impaired Defendant's right of recourse.  Restatement § 37(3)(f).  Although the Restatement refers to the secondary obligor's recourse against the principal obligor, the same logic applies to the secondary obligor's recourse against third parties.  *Id.* § 44, cmt *a* ("it is the fact of such impairment, and not the particular act bringing it about, that gives rise to the secondary obligor's loss and the resulting discharge").  As described above, Defendant had arranged to pass through 100 percent of its liability on the Subject Bond to LGIC, its re-insurer.  Because of Customs' failure to timely issue a bill until after LGIC went insolvent, Defendant was deprived of its bargained-for recourse against LGIC.  Further, as a consequence of the settlement of Defendant's claim against Kingsway under their indemnification and hold harmless agreements, necessitated by the costs, delays and uncertainties of litigation, reimbursement from Kingsway is limited to 60 percent of Defendant's losses. Reimbursement is further capped at $4.8 million, and reimbursement is limited to only those losses submitted by Defendant through the termination date of the later of June 30, 2025, or five years after Kingsway fully funds the escrow account. Defendant is responsible for the remainder of these losses and legal fees, despite the fact that the entire bond program was designed to expose it to zero risk.

Defendant's entire obligation to Customs under the Subject Bond should be discharged under the "loss of recourse" approach.  Under this approach, "an aggrieved party's remedy should put that party in as good a position, but not a better one, as would have been the case if the other party had not impaired the aggrieved party's rights" and the "secondary obligor [is discharged] from liability on the secondary obligation to the extent that the impairment of recourse would otherwise prejudice the secondary obligor …."  Restatement § 37, cmt. *a*. *See also id.* § 44, cmt. *a* ("the secondary obligor discharged from its duties to the obligee to the extent necessary to avoid

this loss"). As explained above, Defendant would not have incurred any liability under the Subject Bond but for Customs' policy change.

## IV.    CONCLUSION

By pursuing this third action when they have already struck out twice with this Court, Customs continues to press an illogical and losing prerogative that it can act in an arbitrary and capricious fashion, and that the clock does not start until they say so, regardless of whether the passage of time leads to prejudice against the surety. Indeed, Customs seems intent to continue using taxpayer dollars to pursue U.S. companies simply to demonstrate that Customs need not be timely, reasonable, or accurate – but rather that market participants must comply "because I said so." This ignores the basic tenets that contract language and duly promulgated law matter, that time is money, that corporate knowledge and files are lost due to the extreme passage of time, and that Aegis has been severely prejudiced. Indeed, no counterparties remain from which Aegis can adequately remedy Customs' punitive and tardy economics to the degree that Aegis is held harmless, as was the original intent of its agreements with Avalon, LGIC and Kingsway. Whether through lack of diligence or mere negligence, Customs did not execute its duty in this instance. And when presented timely with a demand in the past, Aegis had paid timely, and has timely been reimbursed in full by its counterparties LGIC and Kingsway. Customs' laxity made reimbursement impossible in this case.

For the foregoing reasons, Defendant respectfully requests that the Court enter summary judgment in its favor and dismiss the United States' complaint.

**Public Version, Confidential Material Omitted**

Respectfully submitted,

_/s/ Jason M. Kenner_                          _/s/ Jeffery M. Telep_
Jason M. Kenner                               Jeffery M. Telep
Sandler, Travis & Rosenberg P.A.              King & Spalding LLP
675 Third Avenue                              1700 Pennsylvania Avenue NW
Suite 2425                                    Suite 900
New York, New York 10017                      Washington, D.C. 20006
Tel.: 212-549-0137                            Tel.: 202-626-2390
E-Mail: jkenner@strtrade.com                  E-Mail: jtelep@kslaw.com

_Attorneys for Defendant Aegis Security Insurance Company_

October 21, 2024

**CERTIFICATE OF COMPLIANCE**

I, Jeffrey M. Telep, an attorney at the law offices of King & Spalding LLC, who is responsible for the Defendant's memorandum in support of Defendant's motion for summary judgment, dated October 21, 2024, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 11,827 words.

*/s/ Jeffrey M. Telep*

# APPENDIX A

███████████

| **From:** | ███████████████████████ < ███████████████ |
| --- | --- |
| | > |
| **Sent:** | Friday, September 13, 2024 12:50 PM |
| **To:** | ███████████ ; ███████████ ███ |
| **Subject:** | Aegis/Safa Metal Works matter |

Good afternoon,

I am an attorney for U.S. Customs and Border Protection (CBP), and I am reaching out to you concerning CBP's demand to surety Aegis for the below-listed bills associated with entries made by Safa Metal Works Inc.  The total outstanding balance of these bills is currently $9,956.75.

| Entry Number | Bill # | Total Due as of 9/13/24 |
| --- | --- | --- |
| 11013586278 | 47867890000 | $ 479.96 |
| 11045703867 | 47877807000 | $ 2,359.45 |
| 11045720051 | 47877808000 | $ 3,959.65 |
| 11045584713 | 47877805000 | $ 1,492.49 |
| 11001292806 | 47867892000 | $ 1,665.20 |
| | Total | $ 9,956.75 |

It is my understanding that in email correspondence dated May 7, 2021 between ███████████ and ████ ███████ , ███ stated as follows with respect to these entries:

I've consulted with our counsel, ███████████ , and he advises the liquidation instructions for the five bills, MSG 1032302 issued on
2/01/2011 indicate that suspension of liquidation of the entries occurred on 11/14/2006 with publication in the Federal Register of the
Final Results of Administrative Review 71 Fed Reg 66304. The entries would have liquidated by operation of law on May 14, 2006. The
statute of limitations has run under our reading of the statute of limitations. CBP's new theory that sets the running of the statute at the
time the duties are billed not when the entries are liquidated is currently being litigated by Aegis in the Linyi Sanshan case. Upon
resolution of that case, we will re-evaluate the Safa Metal file.

***
With the approaching statute of limitations deadline as CBP understand it, I will be referring these bills to the Department of Justice for collection action in the near future.  Given the relatively low dollar amount at issue, I wanted to double-check with your office that there was no intention on Aegis' part to make payment for these entries prior to the initiation of legal action.  In the event Aegis intends to make payment, I would appreciate if you could let me know as soon as possible.  Please do not hesitate to let me know if you have any questions or if there are any issues you would like to discuss.

Of course, CBP reserves all of its rights in these matters. Nothing herein is intended as a waiver of any said rights, nor should be interpreted as such.

PRIVILEGED AND CONFIDENTIAL – CIRCULATION RESTRICTED

██████████████████

Senior Attorney
Office of Assistant Chief Counsel – Indianapolis
U.S. Customs and Border Protection
Attn: Mail Stop 103 C-1
8899 E. 56th Street
Indianapolis, IN 46249-3300
Office Phone (direct): ██████████████
Work Cell: ██████████
Fax: ██████████

Visit the Trade and Finance Sharepoint Site

***
**PRIVILEGED AND CONFIDENTIAL- CIRCULATION RESTRICTED**

This electronic communication, along with any attachment(s), contains confidential U.S. Government information intended for internal government use only. This electronic communication and its attachment(s) also contain information that is privileged as well as exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. §552, including attorney work product, material that is part of the agency's deliberative process, and communications between attorney and client concerning legal matters for which the client has sought professional advice. The contents of this electronic communication and its attachment(s) are solely intended for the use by the addressee(s) designated herein, and must be controlled, stored, handled, transmitted, distributed, and disposed of in a manner that restricts access to only the designated addressee(s) and to those within U.S. Customs and Border Protection (CBP) who have an official "need-to-know."

If you are not a designated addressee of the electronic communication or a CBP official with a "need-to-know," you are prohibited from reviewing, using, copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the communication or its attachments within or outside CBP without prior, written approval from the Commissioner of CBP and the Office of the Associate Chief Counsel, Trade and Finance. Please notify the sender immediately and permanently delete this electronic communication, and any copies or printouts of the communication and its attachments.